UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
RONALD GRUTZ,                             :
                                          :
            Plaintiff,                    :
                                          :  CASE NO.: _____
    -against-                             :
                                          :
MELLANOX TECHNOLOGIES, LTD.,              :
IRWIN FEDERMAN, UMESH PADVAL,             :
STEVE SANGHI, AMAL M. JOHNSON,            :
GLENDA DORCHAK, DAVID                     :
PERLMUTTER, JON A. OLSON, GREGORY         :
L. WATERS, EYAL WALDMAN, and JACK         :
R. LAZAR                                  :
                                          :
            Defendants.                   :
----------------------------------------- X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Ronald Grutz ("Plaintiff"), on behalf of himself, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.   This is an action brought by Plaintiff against Mellanox Technologies, Ltd. ("Mellanox" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Mellanox, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger of NVIDIA Corporation

("NVIDIA") with Mellanox.

2. On March 10, 2019, Mellanox, NVIDIA, NVIDIA International Holdings, Inc. ("Parent"), and Teal Barvaz Ltd., a wholly-owned subsidiary of Parent ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Mellanox, with Mellanox surviving as a wholly-owned subsidiary of Parent (the "Proposed Transaction").

3. Under the terms of the Merger Agreement, each outstanding share of Mellanox common stock will be converted into the right to receive $125.00 per share of Mellanox common stock owned (the "Merger Consideration").

4. On May 8, 2019, in order to convince Mellanox's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Form DEFM14A Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Mellanox and NVIDIA; (ii) the background process leading up to the execution of the Merger Agreement; and (iii) potential conflict of interests affecting certain members of the Board.

6. The special meeting of the Company's shareholders to vote on the Proposed Transaction is quickly approaching on June 20, 2019. It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting of Mellanox shareholders so Plaintiff can properly exercise his corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Plaintiff and Mellanox's public common shareholders sufficiently in advance of the special meeting of the Company's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Mellanox's common stock is listed and traded on the Nasdaq Capital Market, which is also headquartered in this District. *See, e.g., United States v. Svoboda*,

347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).  Furthermore, Mellanox has a regional office in this District located at 165 Broadway, Suite 2301, New York, NY 10006.  Moreover, Mellanox has retained MacKenzie Partners, Inc. as its Proxy Solicitor, which is located in this District at 1407 Broadway, 27th Floor, New York, NY 10018.

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of Mellanox common stock.

12. Defendant Mellanox is an Israeli corporation that maintains its principal place of business at 350 Oakmead Parkway, Suite 100, Sunnyvale, CA 94085.  Mellanox's common shares are traded on the Nasdaq Capital Market under the ticker symbol "MLNX."

13. Defendant Irwin Federman is, and has been at all relevant times, a director of the Company.

14. Defendant Umesh Padval is, and has been at all relevant times, a director of the Company.

15. Defendant Steve Sanghi is, and has been at all relevant times, a director of the Company.

16. Defendant Amal M. Johnson is, and has been at all relevant times, a director of the Company.

17. Defendant Glenda Dorchak is, and has been at all relevant times, a director of the Company.

18. Defendant David Perlmutter is, and has been at all relevant times, a director of the Company.

19. Defendant Jon A. Olson is, and has been at all relevant times, a director of the

Company.

20. Defendant Gregory L. Waters is, and has been at all relevant times, a director of the Company.

21. Defendant Eyal Waldman is, and has been at all relevant times, a director of the Company.

22. Defendant Jack R. Lazar is, and has been at all relevant times, a director of the Company.

23. The defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Mellanox, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

24. Mellanox is a fabless semiconductor company. The company is an integrated supplier of interconnect products and solutions based on the InfiniBand and Ethernet standards. Mellanox operates in the development, manufacturing, marketing and sales of interconnect products segment. The Company's products facilitate data transmission between servers, storage systems, communications infrastructure equipment and other embedded systems. It operates its business globally and offers products to customers at various levels of integration. The products it offers include integrated circuits (ICs), adapter cards, switch systems, multi-core and network processors, cables, modules, software, services and accessories.

25. NVIDIA focuses on personal computer (PC) graphics, graphics processing unit (GPU), and on artificial intelligence (AI). The Company provides service to its customers through PC, mobile, and cloud architectures. The Company operates through two segments: GPU and

Tegra Processor, which are based on a single underlying architecture. The Company's processor has created platforms that address four markets: Gaming, Professional Visualization, Datacenter, and Automotive.

26. On March 10, 2019, the Board caused the Company to enter into the Merger Agreement.

27. Pursuant to the terms of the Merger Agreement, each outstanding share of Mellanox common stock will be converted into the right to receive $125.00 per share of Mellanox common stock owned.

28. On March 11, 2019, Mellanox and NVIDIA issued a joint press release announcing the Proposed Transaction, which stated in relevant part:

> **NVIDIA to Acquire Mellanox for $6.9 Billion**
>
> — *Unites leaders in processing and interconnect for the high performance computing market*
>
> —*Builds on the companies' long history of collaboration and joint innovation*
>
> — *NVIDIA will conduct a webcast today at 8:30 a.m. Eastern Time/5:30 a.m. Pacific Time* —
>
> **SANTA CLARA, Calif., and YOKNEAM, Israel—March 11, 2019**
> NVIDIA and Mellanox today announced that the companies have reached a definitive agreement under which NVIDIA will acquire Mellanox. Pursuant to the agreement, NVIDIA will acquire all of the issued and outstanding common shares of Mellanox for $125 per share in cash, representing a total enterprise value of approximately $6.9 billion. Once complete, the combination is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow.
>
> The acquisition will unite two of the world's leading companies in high performance computing (HPC). Together, NVIDIA's computing platform and Mellanox's interconnects power over 250 of the world's TOP500 supercomputers and have as customers every

major cloud service provider and computer maker.

The data and compute intensity of modern workloads in AI, scientific computing and data analytics is growing exponentially and has put enormous performance demands on hyperscale and enterprise datacenters. While computing demand is surging, CPU performance advances are slowing as Moore's law has ended. This has led to the adoption of accelerated computing with NVIDIA GPUs and Mellanox's intelligent networking solutions.

Datacenters in the future will be architected as giant compute engines with tens of thousands of compute nodes, designed holistically with their interconnects for optimal performance.

An early innovator in high-performance interconnect technology, Mellanox pioneered the InfiniBand interconnect technology, which along with its high-speed Ethernet products is now used in over half of the world's Top500 supercomputers and in many leading hyperscale data centers.

With Mellanox, NVIDIA will optimize datacenter-scale workloads across the entire computing, networking and storage stack to achieve higher performance, greater utilization and lower operating cost for customers.

"The emergence of AI and data science, as well as billions of simultaneous computer users, is fueling skyrocketing demands on the world's datacenters," said Jensen Huang, founder and CEO of NVIDIA. "Addressing this demand will require holistic architectures that connect vast numbers of fast computing nodes over intelligent networking fabrics to form a giant datacenter-scale compute engine.

"We're excited to unite NVIDIA's accelerated computing platform with Mellanox's world-renowned accelerated networking platform under one roof to create next-generation datacenter-scale computing solutions. I am particularly thrilled to work closely with the visionary leaders of Mellanox and their amazing people to invent the computers of tomorrow."

"We share the same vision for accelerated computing as NVIDIA," said Eyal Waldman, founder and CEO of Mellanox. "Combining our two companies comes as a natural extension of our longstanding partnership and is a great fit given our common performance-driven cultures. This combination will foster the creation of powerful technology and fantastic opportunities for our people."

The companies have a long history of collaboration and joint innovation, reflected in their recent contributions in building the world's two fastest supercomputers, Sierra and Summit, operated by the U.S. Department of Energy. Many of the world's top cloud service providers also use both NVIDIA GPUs and Mellanox interconnects. NVIDIA and Mellanox share a common performance-centric culture that will enable seamless integration.

Once the combination is complete, NVIDIA intends to continue investing in local excellence and talent in Israel, one of the world's most important technology centers. Customer sales and support will not change as a result of this transaction.

**Additional Transaction Details**
Post close, the transaction is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow. NVIDIA intends to fund the acquisition through cash on its balance sheet. In addition, there is no change to its previously announced capital return program for the rest of fiscal 2020. The transaction has been approved by both companies' boards of directors and is expected to close by the end of calendar year 2019, subject to regulatory approvals as well as other customary closing conditions, including the approval by Mellanox shareholders of the merger agreement.

**Advisors**
Goldman Sachs & Co. LLC served as exclusive financial advisor to NVIDIA and Jones Day served as legal advisor. Credit Suisse Group and J.P. Morgan Chase & Co. served as financial advisors to Mellanox and Latham & Watkins, LLP and Herzog Fox & Neeman served as legal advisors.

**The Proxy Omits Material Information**

29.     On May 8, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

30. With respect to J.P. Morgan's *Public Trading Multiples Analysis*, the Proxy does not disclose the basis for using (i) a CY2019E P/E multiple reference range for the Company of 14x to 18x; and (ii) a CY2019E FV/EBITDA multiple reference range for the Company of 12x to 16x. *Id*. at 73-74.

31. With respect to J.P. Morgan's *Selected Transaction Multiples Analysis*, the Proxy does not disclose the criteria and equity values of the companies used in the analysis. *Id.* at 74-75.

32. With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy does not disclose the reasons for using a range of discount rates from 10-12%. *Id.* at 76.

33. With respect to J.P. Morgan's Analyst Price Targets for the Company, the Proxy does not disclose the identity of the research analysts and their corresponding price targets. *Id.*

34. With respect to Credit Suisse's *Selected Companies Analysis*, the Proxy does not disclose the basis for using a (i) multiple range of 9.0x to 13.0x to the Company's CY2019E Adj. EBITDA; (ii) multiple range of 12.0x to 16.0x to the Company's CY2019E Adj. EPS; (iii) a multiple range of 8.0x to 12.0x to the Company's CY2020E Adj. EBITDA; and (iv) a multiple range of 10.0x to 14.0x to the Company's CY2020E Adj. EPS. *Id.* at 80-81.

35. With respect to Credit Suisse's *Selected Transactions Analysis*, the Proxy does not disclose the criteria and equity values of the companies used in the analysis. *Id.* at 81-82.

36. With respect to Credit Suisse's *Discounted Cash Flow Analysis*, the Proxy does not disclose the reasons for using a range of discount rates from 9-12%. *Id.* at 82.

37. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation."

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

38.     Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

39.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's shareholders, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

40.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

42.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

43.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

44.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Mellanox and NVIDIA; (ii) the background process leading up to the execution of the Merger Agreement; and (iii) potential conflict of interests affecting certain members of the Board.

45.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's common shareholders although they could have done so without extraordinary

effort.

46. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Board, Mellanox's management, Mellanox's outside legal counsel, J.P. Morgan Chase & Co., and Credit Suisse Group all reviewed and assessed financial projections for Mellanox, and further states that the Board considered the fairness opinion provided by J.P. Morgan and Credit Suisse and the assumptions made and matters considered in connection therewith, which included financial projections for Mellanox and NVIDIA. Further, the Individual Defendants were privy to and had knowledge of the projections for Mellanox and NVIDIA and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

47. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required

to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

48.    Mellanox is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

49.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the special meeting of the Company's shareholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

50.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.    The Individual Defendants acted as controlling persons of Mellanox within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Mellanox, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

52.    Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

54. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and/or permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 23, 2019               **MONTEVERDE & ASSOCIATES PC**

　　　　　　　　　　　　　　　　 */s/ Juan E. Monteverde*
　　　　　　　　　　　　　　　　Juan E. Monteverde (JM-8169)
　　　　　　　　　　　　　　　　The Empire State Building
　　　　　　　　　　　　　　　　350 Fifth Avenue, Suite 4405 New York, NY 10118 Tel:(212) 971-1341
　　　　　　　　　　　　　　　　Fax:(212) 202-7880
　　　　　　　　　　　　　　　　Email: jmonteverde@monteverdelaw.com

　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*